IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs May 10, 2016

## STATE OF TENNESSEE v. GUY B. BERNAL

**Appeal from the Circuit Court for Maury County**
No. 19492    Stella L. Hargrove, Judge

_____

**No. M2015-01489-CCA-R3-CD – September 26, 2016**

_____

A Maury County jury found the Defendant, Guy B. Bernal, guilty of rape. The trial court sentenced the Defendant as a Range I offender to twelve years in the Tennessee Department of Correction. On appeal, the Defendant asserts that: (1) his right against self-incrimination was violated when the trial court did not conduct a proper *Momon* hearing; (2) the convicting evidence is insufficient; and (3) his twelve-year sentence is excessive. After a thorough review of the record and applicable law, we affirm the trial court's judgment.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

ROBERT W. WEDEMEYER, J., delivered the opinion of the Court, in which NORMA MCGEE OGLE and TIMOTHY L. EASTER, JJ., joined.

Jacob J. Hubbell, Columbia, Tennessee, for the appellant, Guy B. Bernal.

Herbert H. Slatery III, Attorney General and Reporter; Clark B. Thornton, Senior Counsel; Brent A. Cooper, District Attorney General; and Daniel J. Runde, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

In February 2010, a Maury County grand jury indicted the Defendant for the rape of his stepdaughter ("the victim"). At the trial on the charge, the parties presented the following evidence: The victim testified that on November 28, 2009, she lived at a residence on Kristen Street with her mother, five-year old brother, and step-father, the Defendant. She said that she was thirteen at the time of the incident. She recalled that she had been sick on Thanksgiving and woke up still sick the following day, Friday, November 27, 2009. The victim "laid around" most of the day due to her illness and did

not leave her home. She said that the Defendant arrived home from his work at Cracker Barrel at around 5:00 p.m., changed out of his work clothes, and began drinking beer.

The victim testified that at around 8:00 p.m., she took a shower and dressed in a bra, t-shirt, fuzzy pajama pants, and socks. She confirmed that she was not wearing underwear. After her shower, the victim lay on the couch in the living room and watched television. The victim said that the Defendant was seated on the couch next to her, drinking beer. At some point, the victim's mother and brother went to the master bedroom to go to sleep for the night. The victim recalled that her mother told her to sleep in her brother's downstairs bedroom, so she would not have to go to her bedroom upstairs.

The victim testified that the pallet in the living room was for her brother. She explained that her brother had difficulty falling asleep, and her mother had asked her to lie down next to her brother on the pallet to try to help him fall asleep. The victim, however, remained on the couch while her mother and brother lay on the pallet until her mother decided to go to bed. The victim then went to her brother's room and was falling asleep when the Defendant came in the room and told her that her mother wanted her to go lie on the pallet in the living room. The Defendant then picked the victim up and carried her to the living room. He placed her on the pallet where she watched television until she fell asleep. The victim estimated that the Defendant retrieved her from her brother's bedroom at around 11:00 p.m. and that she watched television for fifteen minutes before falling asleep in the living room.

The victim testified that while she was asleep in the living room, the Defendant removed her pajama pants and performed oral sex on her. She said that she awoke during this incident but pretended to be asleep because she was scared. Her mother walked into the room from the master bedroom and began yelling at the Defendant. The victim said that her mother told her to put on her pants and go into the master bedroom. The victim's mother came into the master bedroom, closed the door, and called the police. The victim recalled that the Defendant knocked on the bedroom door and said, "Don't make a big deal out of it," or something to that effect.

The victim testified that the police arrived, and she remained in the master bedroom. At some point she was taken to the hospital for an examination, and the police collected the clothing she had been wearing at the time of the incident.

C.B., the victim's mother, testified that she and the Defendant were married in March 2003. Before they married, she worked at Home Depot, and the Defendant worked as a subcontractor and installed doors and windows for Home Depot. In 2002,

2

she, the Defendant, the victim, and the Defendant and C.B.'s son moved to the residence on Kristen Street.

C.B. testified that the day after Thanksgiving 2009, she and the victim were both sick. She said that the Defendant went to work that day, November 27, 2009, while she and her children stayed home resting due to illness. She could not recall the specific time that the Defendant returned home from work but said that it was dark and "maybe 7:00 or 8:00" p.m. When the Defendant arrived home, he went over to the laptop computer located in the "alcove off the kitchen." She said the Defendant's "normal habit" was to drink two or three Fosters beers each night.

C.B. testified that, at some point, the Defendant put blankets and pillows on the floor to try to help their son wind down for the night. At some point that night, the victim took a shower and then returned to the couch. C.B. said that she told the victim to sleep in her brother's room because she was sick. C.B. was lying on the floor with her son, but she could not get him to sleep because the television was too loud. She said that she took her son into the master bedroom to get him to sleep and closed the door. C.B. recalled that she could not sleep due to throat pain so she got up and exited the bedroom to retrieve aspirin. She estimated that this was twenty to thirty minutes after she had taken her son into the master bedroom. When she exited the bedroom, she saw the victim, unclothed from the waist down, lying on her back with her legs up and the back of the Defendant's head between the victim's legs. She said that she yelled at the Defendant, "What are you doing anyways?" The Defendant responded saying, "Don't make a big deal."

C.B. testified that she sent the victim to the master bedroom and that she and the Defendant went to their son's room to talk. She asked the Defendant how long "this" had been going on, and the Defendant once again responded, "Don't make a big deal out of it." C.B. told the Defendant to go outside and smoke and when he did, she went to the master bedroom, closed the door, and called 911. C.B. asked the victim about what had occurred, and the victim stated that she did not know, that she was asleep. C.B. told the victim what she had seen, and the victim said that she felt sick and went to the bathroom.

C.B. testified that the Defendant came to the bedroom door, knocked, and told her that she did not want to make a big deal out of this "and you know what I'm talking about." The police arrived shortly thereafter.

C.B. identified a letter the Defendant sent her from jail in July 2010. She read a portion of the letter aloud as follows:

3

This is [the Defendant's] concise statement of the night and the morning of his arrest. I worked two jobs that day and got home late. I drank several beers that night, as I always do. I laid down on my living room floor no more than 20 feet from my wife, who is a very light sleeper. My autistic son, [ ], was asleep on my side of the bed. I laid close to the bedroom door, so I could hear my alarm in the morning. I had a double shift the next day. I am also hard of hearing. So while I was laying [sic] on my living room floor, drunk and asleep, my stepdaughter, [the victim], came onto me and took advantage of me. A detailed statement will be given via a polygraph machine. The results and all of my notes will be forwarded to the ACLU of Tennessee in an attempt to obtain their legal assistance, per my correspondence, my case warrant, their agencies dependent.

Eric Pinkerton, a Spring Hill Police Department officer, testified that in the early morning hours of Saturday, November 28, 2009, he was dispatched to a residence located on Kristen Street. He arrived at the residence at 1:33 a.m., and he and Officer Michael Biggs, who arrived at the same time, knocked on the front door. After several minutes, the Defendant opened the door. Officer Pinkerton stepped inside the residence into the foyer area of the home and asked the Defendant about the reason for the request for the police, and the Defendant stated he had "no clue why [they] were there."

Officer Pinkerton testified that, from the foyer of the residence, he observed a "makeshift bed or pallet" on the living room floor. He recalled that Officer Biggs interviewed the victim and the victim's mother, C.B., in a separate room outside the Defendant's presence. While Officer Biggs interviewed the others, Officer Pinkerton remained in the foyer speaking with the Defendant. The Defendant told Officer Pinkerton that he had been sleeping when the victim's mother "came in" and "overreacted." Officer Pinkerton then asked the Defendant "how do you overreact to sleeping?" To which the Defendant responded that the victim's mother was "crazy." Officer Pinkerton asked the Defendant if he could have been doing anything that could have been misconstrued, and the Defendant did not answer. Officer Pinkerton testified that he advised the Defendant of his *Miranda* rights and that the Defendant said he did not have anything else to say.

On cross-examination, Officer Pinkerton testified that the Defendant appeared to be awake when he answered the door and did not show any signs of intoxication. He recalled that the house was dimly lit, but he maintained that the Defendant appeared "more coherent" than someone who had been awakened by the knocking on the door. Officer Pinkerton estimated that he advised the Defendant of the *Miranda* rights approximately ten minutes after he entered the residence and that he was in the residence for approximately forty-five minutes. Officer Pinkerton testified that he then placed the

4

Defendant in a police vehicle, where the Defendant remained for approximately thirty minutes before transport to the Maury County jail.

Michael Biggs, a Spring Hill Police Department officer, testified that shortly after his entry into the house on Kristen Street, Corporal Kennedy arrived. Corporal Kennedy and Officer Biggs went to the master bedroom of the house with the victim and her mother. The victim's mother told the officers about what had occurred. Officer Biggs said that the victim was crying and told officers that she had been asleep and did not know what had occurred. Officer Biggs returned to the entryway and asked the Defendant about what had occurred at the residence to cause the police to be summoned. The Defendant stated, "To save anymore further embarrassment, whatever she said I did, I did." Officer Pinkerton then escorted the Defendant from the house. Officer Biggs remained on the scene until detectives arrived to assume the investigation.

Geoff Betts, a Spring Hill Police Department officer, testified that he first spoke with the Defendant at the police department at around 2:00 a.m. on November 28, 2009. The Defendant declined to provide a statement and requested an attorney. Sergeant Betts then went to the Kristen Street residence at approximately 2:30 a.m., where he spoke with the crime scene technician about the evidence to be collected. He stated that, while there, he observed a make-shift pallet on the floor of the living room. When he left the residence, he contacted Detective Lovett and asked if she would assist with the interview of the victim and the rape kit at the hospital. Sergeant Betts then proceeded to the Maury County Sheriff's Department to swear out a warrant for the Defendant's arrest. Sergeant Betts testified that after obtaining the warrant, he went to Maury Regional Hospital where he spoke with the victim's mother, C.B.

On cross-examination, Sergeant Betts testified that he did not consider whether the physical contact was initiated by the victim based upon C.B.'s statement that she walked into the living room and saw the Defendant's "face in her daughter's crotch." She told Sergeant Betts that the Defendant was holding the victim's legs up in the air. Sergeant Betts said that the victim was thirteen years old and the Defendant in his forties at the time of this incident. He said that when he attempted to speak with the Defendant about his "side of the story," the Defendant declined.

Charles Hardy, a Tennessee Bureau of Investigation ("TBI") special agent, testified that he conducted testing on the sexual assault collection kit related to this case. Testing of the vaginal swab did not reveal the presence of semen; however, there was a limited amount of alpha-amylase, which indicated that saliva could be present. Agent Hardy explained that body fluids other than saliva contain amylase but that a positive screening for alpha-amylase was a "good indicator" that there was the presence of saliva.

After this proof, the State rested and the Defendant recalled Sergeant Betts. Sergeant Betts testified that he met with the Defendant briefly at the Spring Hill Police Department, and then the Defendant was transported to the Maury County Jail. The video recording taken inside the police vehicle where the Defendant was placed after he was removed from the residence was played. Sergeant Betts agreed that the Defendant did not appear to be agitated or upset. According to the time stamp on the recording, an officer got into the vehicle with the Defendant after approximately thirty-two minutes, and Sergeant Betts estimated that the drive time to the police department was ten minutes. The time stamp on the recording indicated that the Defendant remained in the police vehicle for an additional twenty minutes after arriving at the police department.

Sergeant Betts testified that, at the time he met with the Defendant at the police department, he was aware that an officer had told the Defendant his *Miranda* rights; however, he advised the Defendant again of these rights. Sergeant Betts said that when he advised the Defendant that he was being charged with rape, the Defendant showed no emotion. Based upon the video recording time stamp, the Defendant was inside the police department for roughly five minutes before being returned to the vehicle and transported to the Maury County Jail. Sergeant Betts agreed that, in total, based upon the video recording, it appeared that the Defendant was handcuffed in the back of the police car for an hour and fifteen minutes. During this time, the Defendant was either humming, looking around, or appeared to be asleep.

On cross-examination, Sergeant Betts stated that when he met with the Defendant at the police station, the Defendant did not appear to be intoxicated. He confirmed that the Defendant appeared to be alert and oriented when he spoke with Sergeant Betts.

The Defendant testified that several days to a week before the alleged rape occurred, he developed a rash due to an allergic reaction to an antibiotic. To help alleviate the symptoms of the allergic reaction, the Defendant took fifty milligrams of Benadryl which left him "loopy and cloudy in the head." During this time, he also worked two jobs. One job was remodeling a residence in Spring Hill, and the other job was as a server at Cracker Barrel.

The Defendant testified about the events of the day leading up to the alleged rape. He said that he worked out in the morning and then went to his job remodeling. He briefly returned home for a shower and then went to his job at Cracker Barrel for the 5:00 p.m. shift. He stated that he was normally released from his shift between 8:30 and 9:30 p.m. After leaving work, he said it was likely he picked up beer and a movie on the way home. He said his normal routine was to "wind down" at night with a beer while watching a movie. He estimated that he arrived home at approximately 10:00 p.m. He

6

recalled that C.B. and their son were sick. He sat down on the couch and drank a beer while watching the movie. C.B. and their son were lying on a pallet on the floor. He did not recall how many beers he drank that night but estimated that it was likely three.

The Defendant testified that, at some point, C.B. took their son into the master bedroom and returned briefly to ask the Defendant to lower the volume on the television. The Defendant explained that he had difficulty with his hearing, so he normally kept the television volume high. C.B. returned to the bedroom and closed the door to shut out the noise from the television. The Defendant said that he was alone in the living room and, at some point, "would have taken [his] Benadryl." In recalling the evening, the Defendant said, "I would have watched this movie. And when the movie ended, it would have been time for me to go to sleep." He said that he was seated on the couch while watching the movie.

The Defendant testified that "[a]t some point" the victim "was now on the living room floor sleeping on this pallet." The Defendant stated that he did not remember how the victim got from her brother's bedroom to the living room pallet. He said that the victim always slept in her bedroom, and he did not know why she was sleeping in her brother's room. He then stated, "And how she got to the living room, the only thing I can think of is she asked me if she could. And was it uncommon for her to ask me to carry her? No."

The Defendant testified that when he went into the master bedroom, his son was asleep in the bed with his wife. He did not want to disturb his son so he set his alarm to wake him for work the following morning and went back to the living room. The Defendant said that he considered sleeping on the floor of the master bedroom at the foot of the bed but did not because C.B. had difficulty with her vision at night, and he was afraid she might step on him. The Defendant said that he left the bedroom door open so he could hear the alarm in the morning and lay down on the pallet next to the victim. The Defendant then described the events that led to his arrest as follows:

> The next thing that I remember is somebody is taking my right hand, and again somebody - - at this point, I don't know who was doing this; and it is all happening in a foggy, dream state. Somebody is taking my right hand to take off their pant bottoms. So the right hand is taking it off, and their leg is pulled out; and then they take my hand, and the left side is taken off. . . .
>
> . . . .
>
> So then this person moves from where they are on the side. They move themselves to my side above my head. At this point, they reach

7

down with their left and, and they take my hand, and place it on the back of their leg.  That would be the thigh area.  So that hand is placed on the thigh area.  Again, I'm not doing anything.  I'm just - - they took my hand and placed it on the thigh. . . .

    . . . .

. . . It was like a dream, but like I was a spectator watching my body being manipulated. . . .

    . . . .

. . . And this person then reached up and took my head, and lowered my head down and onto them.  . . . At no time did I know or was aware that this was really, really taking place, or who was - - or who was doing this. . . .

    . . . .

. . . None of this was voluntary.  None of them was of my own volition.  Then they shook my head; and when they shook my head, I started to lift the hair that was on my mouth.  And then it wasn't even but a few moments after that, that my ex-wife is standing over me and [the victim], and saying - - screaming, which I understand - - screaming, "What are you doing to [the victim]?"  And like a surge of electricity went through my body, and I jumped to my feet.

The Defendant testified that C.B. told him to go outside to smoke, and so he did.  When he returned, he spoke with C.B.  He said that he told her "not to make a big deal out of this" because he was beginning to realize that "what took place was [the victim]," and he thought C.B. was going to embarrass the victim.  C.B. then told the Defendant to go smoke another cigarette, and he again complied.  When he returned, he lay down on the pallet and fell asleep to be later awoken by the police knocking on the front door.

The Defendant testified that he was "out of it" when speaking with the police officers, so he asked for an attorney.  He stated that he "knew that it was [the victim] who had done what had taken place thus far" but was unable to explain to the police what "was going on" because he "wasn't at that very moment able to grasp what was going on."  He described C.B. as "barking down in [his] face," so he told police, "Whatever she said was going on, was going on."  He reiterated that he was "incoherent" from the alcohol and medication.  He vaguely remembered some of the events of the rest of the evening, but he remembered with clarity waking the next morning in a jail cell.  He stated

8

that he had "no idea that [his] stepdaughter was not going to tell what really happened" and was focused on notifying his employer that he would be "running late."

The Defendant testified that, on the night of November 29, 2009, "[e]very bit of" the sexual contact that occurred between him and the victim, the victim initiated. The Defendant stated that he was not "okay" with what had occurred and would have stopped it if he was "able to stop" it. The Defendant speculated that the victim may have been acting out due to marital conflict between him and C.B. over financial issues.

On cross-examination, the Defendant agreed that C.B. did correctly "see what she saw" when she exited the bedroom. He agreed that his mouth was on the victim's vaginal area but clarified that it was the victim who placed his face there. The Defendant maintained that it was the victim who "sexually assaulted" him. The Defendant agreed that one of the scenarios he believed would explain the victim's conduct was that she "sexually attack[ed] . . . [him] to keep [him] from leaving the home." The Defendant said that he could not remember all of the events of the night because of his altered state. He, however, recalled with clarity that he did not tell the victim that her mother was "confused" and wanted the victim to go back into the living room. He stated that the victim asked his permission to return to the living room as she had done "many, many, many other times before." He confirmed that he was "real sure" about how the victim returned to the living room.

On redirect examination, the Defendant clarified that his mouth was not on the victim's vagina but only "on hair."

The State re-called the victim, and she testified that she did not remove her pajama bottoms or use the Defendant's hands to do so. She denied manipulating the Defendant's hand and mouth. She confirmed that she felt the Defendant's mouth on her vagina.

Based upon this evidence, the jury convicted the Defendant of rape. The trial court sentenced the Defendant as a Range I offender to twelve years in the Tennessee Department of Correction. It is from this judgment that the Defendant appeals.

## II. Analysis

On appeal, the Defendant asserts that: (1) his right against self-incrimination was violated when the trial court did not conduct a proper *Momon* hearing; (2) the convicting evidence is insufficient; and (3) his twelve year sentence is excessive.

### A. Momon Hearing

9

The Defendant asserts that his Fifth Amendment right against self-incrimination was violated because the trial court failed to properly advise him, pursuant to *Momon v. State*, 18 S.W. 3d 152 (Tenn. 1999),that the jury could not draw any inferences from a decision not to testify. The State responds that a *Momon* colloquy is not required when a Defendant elects to testify, and the record reflects that the Defendant's decision to testify was knowing and voluntary.

Whether the Defendant's constitutional rights were violated is a question of law, and, as such, we review it *de novo*. *See State v. Walton*, 41 S.W.3d 75, 81 (Tenn. 2001). Tennessee recognizes that defendants have a right to speak on their own behalf at trial. *Momon* at 161. Moreover, only a defendant may waive the right to testify and such a waiver may not be inferred or presumed, but instead it must be openly explored. *Id*. at 161-62. To prove that a defendant's right to testify is not violated, the defense counsel should request a hearing outside the presence of the jury to demonstrate the defendant's waiver of the right to testify has been "knowing[ly], voluntari[ly], and intelligent[ly]" made. *Id*. at 162. No "particular litany" need be used; however, defense counsel must at a minimum show:

the defendant knows and understands that:

(1) the defendant has the right not to testify, and if the defendant does not testify, then the jury (or court) may not draw any inferences from the defendant's failure to testify;

(2) the defendant has the right to testify and that if the defendant wishes to exercise that right, no one can prevent the defendant from testifying;

(3) the defendant has consulted with his or her counsel in making the decision whether or not to testify; that the defendant has been advised of the advantages and disadvantages of testifying; and that the defendant has voluntarily and personally waived the right to testify.

*Id*. These procedures are "prophylactic measures which are not themselves constitutionally required." *Id*. at 163. Therefore, failure to follow the guidelines will not be enough to show that a defendant was deprived of the constitutional right to testify "if there is evidence in the record to establish that the right was otherwise personally waived by the defendant." *Id*.

On appeal, the Defendant contends that the procedural guidelines enumerated in *Momon* were not followed. As the State correctly notes, however, the Defendant did not waive his right to testify. Our Supreme Court has declined to extend the requirement of a *Momon* hearing in cases where a defendant elects to testify as is the case herein. *Mobley*

*v. State*, 397 S.W.3d 70, 91 (Tenn. 2013). The trial court, although not required, conducted a *Momon* hearing and advised the Defendant that he did not have to testify. The Defendant confirmed that he had discussed the decision whether to testify or not with his attorney. The trial court then made the specific finding that the Defendant had made the decision to testify "free and voluntary, with no coercion, force or duress." The transcript supports this conclusion. The Defendant is not entitled to relief as to this issue.

## B. Sufficiency of the Evidence

When an accused challenges the sufficiency of the evidence, this Court's standard of review is whether, after considering the evidence in the light most favorable to the State, "*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *see* Tenn. R. App. P. 13(e); *State v. Goodwin*, 143 S.W.3d 771, 775 (Tenn. 2004) (citing *State v. Reid*, 91 S.W.3d 247, 276 (Tenn. 2002)). This standard applies to findings of guilt based upon direct evidence, circumstantial evidence, or a combination of both direct and circumstantial evidence. *State v. Pendergrass*, 13 S.W.3d 389, 392-93 (Tenn. Crim. App. 1999) (citing *State v. Dykes*, 803 S.W.2d 250, 253 (Tenn. Crim. App. 1990)). In the absence of direct evidence, a criminal offense may be established exclusively by circumstantial evidence. *Duchac v. State*, 505 S.W.2d 237, 241 (Tenn. 1973). "The jury decides the weight to be given to circumstantial evidence, and '[t]he inferences to be drawn from such evidence, and the extent to which the circumstances are consistent with guilt and inconsistent with innocence, are questions primarily for the jury.'" *State v. Rice*, 184 S.W.3d 646, 662 (Tenn. 2006) (quoting *Marable v. State*, 313 S.W.2d 451, 457 (Tenn. 1958)). "The standard of review [for sufficiency of the evidence] 'is the same whether the conviction is based upon direct or circumstantial evidence.'" *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011) (quoting *State v. Hanson*, 279 S.W.3d 265, 275 (Tenn. 2009)).

In determining the sufficiency of the evidence, this Court should not re-weigh or reevaluate the evidence. *State v. Matthews*, 805 S.W.2d 776, 779 (Tenn. Crim. App. 1990). Nor may this Court substitute its inferences for those drawn by the trier of fact from the evidence. *State v. Buggs*, 995 S.W.2d 102, 105 (Tenn. 1999) (citing *Liakas v. State*, 286 S.W.2d 856, 859 (Tenn. 1956)). "Questions concerning the credibility of witnesses, the weight and value to be given the evidence, as well as all factual issues raised by the evidence are resolved by the trier of fact." *State v. Bland,* 958 S.W.2d 651, 659 (Tenn. 1997). "A guilty verdict by the jury, approved by the trial judge, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the theory of the State." *State v. Grace*, 493 S.W.2d 474, 476 (Tenn.1973). The Tennessee Supreme Court stated the rationale for this rule:

This well-settled rule rests on a sound foundation. The trial judge and the jury see the witnesses face to face, hear their testimony and observe their demeanor on the stand. Thus the trial judge and jury are the primary instrumentality of justice to determine the weight and credibility to be given to the testimony of witnesses. In the trial forum alone is there human atmosphere and the totality of the evidence cannot be reproduced with a written record in this Court.

*Bolin v. State*, 405 S.W.2d 768, 771 (Tenn. 1966) (citing *Carroll v. State*, 370 S.W.2d 523, 527 (Tenn. 1963)). This Court must afford the State of Tennessee the "'strongest legitimate view of the evidence'" contained in the record, as well as "'all reasonable and legitimate inferences'" that may be drawn from the evidence. *Goodwin*, 143 S.W.3d at 775 (quoting *State v. Smith*, 24 S.W.3d 274, 279 (Tenn. 2000)). Because a verdict of guilt against a defendant removes the presumption of innocence and raises a presumption of guilt, the convicted criminal defendant bears the burden of showing that the evidence was legally insufficient to sustain a guilty verdict. *State v. Carruthers*, 35 S.W.3d 516, 557-58 (Tenn. 2000) (citations omitted).

Rape is the unlawful sexual penetration of a victim by the defendant by force or coercion. T.C.A. § 39-13-503(a)(1) (2014). Coercion includes "the use of parental, custodial or official authority over a child less than fifteen (15) years of age." T.C.A. § 39-13-501(1) (2014). The statutory definition of "sexual penetration" includes cunnilingus as relevant to this case. *Id.* at 39-13-501(7).

The evidence, viewed in the light most favorable to the State, showed that the Defendant, the victim's stepfather, retrieved the sleeping victim from her brother's bedroom after the other members of the family had gone to bed and were behind a closed door. He laid the victim on a pallet on the living room floor, removed her pants and performed oral sex on the thirteen-year-old victim. C.B., the victim's mother, exited the master bedroom to get aspirin and observed the victim, with her pants off, lying on her back with her legs up. She saw the back of the Defendant's head between the victim's legs with his mouth on the victim's vagina. The Defendant does not contest these facts, rather, he asserts that he was forced by the victim to commit this act which the victim denied. The jury heard the Defendant's version of the events when he testified at trial as well as the victim's account. As stated above, questions concerning the credibility of the witnesses are resolved by the trier of fact. *Bland,* 958 S.W.2d at 659. The jury by its verdict accredited the testimony of the victim. This Court does not second-guess the weight, value, or credibility afforded to the evidence by the jury. Therefore, we conclude that the State presented sufficient evidence to support the Defendant's conviction for rape.

12

## C. Sentencing

As his final issue on appeal, the Defendant asserts that his sentence is excessive. Appellate review of sentences is under the abuse of discretion standard with a presumption of reasonableness. *State v. Bise*, 380 S.W.3d 682, 708 (2012); *see also State v. Caudle*, 388 S.W.3d 273, 278-79 (Tenn. 2012). A finding of abuse of discretion "'reflects that the trial court's logic and reasoning was improper when viewed in light of the factual circumstances and relevant legal principles involved in a particular case.'" *State v. Shaffer*, 45 S.W.3d 553, 555 (Tenn. 2001) (quoting *State v. Moore*, 6 S.W.3d 235, 242 (Tenn. 1999)).

To find an abuse of discretion, the record must be void of any substantial evidence that would support the trial court's decision. *Id.*; *State v. Grear*, 568 S.W.2d 285, 286 (Tenn. 1978); *State v. Delp*, 614 S.W.2d 395, 398 (Tenn. Crim. App. 1980). In the context of sentencing, as long as the trial court places the sentence within the appropriate range and properly applies the purposes and principles of the Sentencing Act, this Court must presume the sentence to be reasonable. *Bise*, at 704-07. As the *Bise* Court stated, "[a] sentence should be upheld so long as it is within the appropriate range and the record demonstrates that the sentence is otherwise in compliance with the purposes and principles listed by statute." *Id.* at 708. We are also to recognize that the defendant bears "the burden of showing that the sentence is improper." *State v. Ashby*, 823 S.W.2d 166, 169 (Tenn. 1991).

In determining the proper sentence, the trial court must consider: (1) the evidence, if any, received at the trial and the sentencing hearing; (2) the presentence report; (3) the principles of sentencing and arguments as to sentencing alternatives; (4) the nature and characteristics of the criminal conduct involved; (5) evidence and information offered by the parties on the mitigating and enhancement factors set out in Tennessee Code Annotated sections 40-35-113 and -114; (6) any statistical information provided by the administrative office of the courts as to sentencing practices for similar offenses in Tennessee; and (7) any statement the defendant made in the defendant's own behalf about sentencing. *See* T.C.A. § 40-35-210 (2014); *State v. Taylor*, 63 S.W.3d 400, 411 (Tenn. Crim. App. 2001).

The Defendant was convicted of rape, a Class B felony. The trial court sentenced the Defendant as a Range I, standard offender. The sentencing range for a Class B felony for a standard offender is eight to twelve years. At the sentencing hearing, the trial court considered the purposes and principles of sentencing in determining a sentence of twelve years. Notably, the trial court found enhancement factor (14), that the Defendant had "abused a position of private trust," and enhancement factor (7), that the offense was committed to gratify the defendant's desire for pleasure or excitement. T.C.A. § 40-35-

114(7), (14) (2014).  The trial court also relied on the Defendant's lack of remorse and his insistence that the victim was the perpetrator of the offense in ordering a twelve-year sentence.

The Defendant specifically challenges the trial court's application of enhancement factor (7), that he committed the offense to gratify his desire for pleasure or excitement. He contends that the State failed to "provide additional objective evidence of the defendant's motivation to seek pleasure or excitement through sexual assault," as required by *State v. Arnett*, 49 S.W.3d 250, 252 (Tenn. 1993).  In determining the sentence, the trial court noted the circumstances surrounding the assault, the manner of the penetration, the location of the sexual act, and the timing.  The Defendant waited until the other family members had gone to bed before carrying the victim to the living room, mere feet from the master bedroom door where his son and his wife were asleep, to perform oral sex on his thirteen-year-old step-daughter.  The trial court properly considered these circumstances in evaluating the Defendant's motive for committing the offense.

The trial court considered the relevant principles and sentenced the Defendant to a within-range sentence.  Based on the evidence at trial, the sentence imposed on the Defendant was not excessive, and the trial court did not abuse its discretion. Accordingly, we conclude that the Defendant is not entitled to relief.

### III. Conclusion

In accordance with the aforementioned reasoning and authorities, we affirm the judgment of the trial court.

_____
ROBERT W. WEDEMEYER, JUDGE

14